Laura Popp-Rosenberg
Leo Kittay
Sydney Kipen
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
151 West 42nd, 17th Floor
New York, New York 10036
Tel. (212) 813-5900
Fax (212) 813-5901
*Email*: lpopp-rosenberg@fzlz.com
        lkittay@fzlz.com
        skipen@fzlz.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OVERTIME SPORTS, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE OHIO STATE UNIVERSITY, <br><br> Defendant. | Case No.: <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** <br><br> **JURY TRIAL DEMAND** |

Plaintiff Overtime Sports, Inc. ("Overtime" or "Plaintiff"), by its undersigned counsel, for its complaint against Defendant The Ohio State University ("Ohio State" or "Defendant") alleges as follows:

<u>SUBSTANCE OF THE ACTION</u>

1.      Overtime is an online and social media-based sports network that uses innovative technology and new platforms to cater to digital-native sports fans.  Since its launch in 2016, Overtime has offered sports programming, with a particular focus on high school basketball and football, as well as a range of branded merchandise, including clothing, shoes and accessories.

2.      As its logo, Overtime uses the distinctive O mark shown here:



(the "Overtime Mark").  The Overtime Mark is distinctive due in large part to its sloping corners within each of its concentric shapes, which contrast with the sharp-cornered rectangle at its center.

      3.     Defendant, a public research university in Columbus, Ohio, purports to be the owner of the O marks shown here:



in connection with, *inter alia*, sporting events and clothing (collectively the "OSU Marks"). The OSU Marks feature an octagonal shape in each of its concentric shapes.  They contain neither any rounded edge nor any rectangle.

      4.     This case arises out of Ohio State's efforts to prevent Overtime from using the Overtime Mark.  Specifically, on July 26, 2019, Defendant sent Overtime a letter alleging that the Overtime Mark is likely to cause confusion with the OSU Marks, demanding that Overtime end all use of the Overtime Mark, expressly abandon its pending trademark applications for the Overtime Mark (Application Serial Nos. 88/325,985 and 88/319,783), and provide written assurances that Overtime would not make any future use of the Overtime Mark.  A copy of the demand letter is attached as **<u>Exhibit A</u>**.  Defendant also opposed Overtime's trademark

applications for the Overtime Mark with the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("USPTO") by filing a Consolidated Notice of Opposition, which is now pending.

5. In light of the clear threat and demand made by Defendant, there is a substantial controversy between the parties, who have adverse legal interests, of sufficient immediacy and reality to warranty the issuance of a declaratory judgment. Accordingly, Overtime seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that (i) its use of the Overtime Mark in connection with its sports programming business and goods and services offered in connection with such business do not infringe any rights the Defendant has in the OSU Marks; (ii) there is no likelihood of confusion arising from Overtime's use or registration of the Overtime Mark in connection with its sports programming business or goods and services offered in connection with such business; (iii) Overtime has not engaged in any acts of unfair competition with Defendant; and (iv) Overtime has not violated any other purported rights of Defendant.

## THE PARTIES

6. Plaintiff Overtime Sports, Inc. is a Delaware corporation having a principal place of business at 20 Jay Street, Suite 600, Brooklyn, NY 11201.

7. Upon information and belief, Defendant The Ohio State University is a public institution of higher learning having a principal place of business at 190 North Oval Mall, Columbus, Ohio 43210.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 2201 to declare the rights of any party seeking a declaration and under Section 39 of the Lanham Act, 15 U.S.C. § 1121, because this action arises from Defendant's unmeritorious claims that Overtime's use and registration of

the Overtime Mark is likely to cause confusion with Defendant's OSU Marks.  The Court also has jurisdiction under 28 U.S.C. §§ 1331 because this action arises under federal law and 1338(a) because this action arises under trademark law.

9.      The Court has personal jurisdiction over Defendant under Sections 301 and/or 302 of the New York Civil Practice Laws and Rules because (i) Defendant is operating, conducting, engaging in, and carrying on a business in this State, including selling the goods and services on which it bases its claims; and (ii) the events giving rise to this Complaint occurred in this State and/or had effects in this State.

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claims occurred in this District.

## FACTS GIVING RISE TO THIS ACTION

**A.      Overtime Sports, Inc. and its Overtime Mark**

11.     Founded in 2016, Overtime is a sports network focused on young, digital-native sports fans.  The company offers sports-related entertainment programming on multiple platforms including its Instagram, Twitter, Facebook, YouTube, Snapchat, Overtime's website (overtime.tv) and television.  Its short-form programming is provided by a network of paid contributors, who attend games throughout the country and upload highlights in real-time from their mobile phones using innovative software, which Overtime then publishes.  Overtime's longer-form programming is produced by Overtime employees.

12.     Overtime first achieved renown for publishing sports videos, including highlights of high school sporting events, on its social media channels and has since expanded into producing and displaying a variety of original programming, offering branded merchandise and presenting live events.

{F3334575.3 }                                            - 4 -

13.     Overtime's popularity has exploded in the few short years since its launch. Overtime has over one billion views per month and over twenty million followers across seven digital platforms.  Its audience now views over 250 million minutes of Overtime's content each month.

14.     As part of its business, Overtime offers a variety of Overtime-branded clothing, shoes, and accessories sold under the word mark OVERTIME and the Overtime Mark.

15.     The Overtime Mark is distinctive due in large part to the sloping corners of each of its concentric lines, which contrast with the sharp rectangle shape at its center, as shown below:



16.     Overtime has spent significant resources advertising and promoting its Overtime brand in conjunction with its Overtime Mark across a variety of mediums, including in news articles, social media, and in print advertising.

17.     As a result of, *inter alia*, the differences in the marks at issue and the manners of use, ordinarily prudent consumers are not likely to be confused as to the source or sponsorship of Overtime's products and services or to believe Overtime or its products and services are associated with Defendant.

18.     To protect its rights in the Overtime Mark in the United States, on February 28, 2019, Overtime filed Application Serial No. 88/319,783 with the USPTO to register the Overtime Mark for use in connection with the following goods and services:

- "Downloadable software application for use in distribution of multimedia programs and entertainment content featuring sports, popular culture, current events, reality, drama and comedy, distributed via various media platforms, including via the internet, mobile networks, wireless devices and television, where viewers can contribute, post, customize and share stories, articles, video, images and commentary and form virtual communities in social networking in the field of sports" in International Class 9;

- "Online retail store services featuring apparel, sports equipment, virtual goods, namely, virtual money purchased for online games; promotional sponsorship of sports games, leagues and events; Organizing, promoting and conducting exhibitions and events for commercial, promotional or advertising purposes, via multimedia programs featuring sports, popular culture, current events, reality, drama and comedy, distributed via various media platforms, including via the internet, mobile networks, wireless devices and television" in International Class 35;

- "Providing entertainment and information services, namely, production and distribution of multimedia programs and entertainment content in the nature of videos, images, movies, articles and podcasts featuring sports, popular culture, news, reality, drama and comedy distributed via various media platforms, including the internet, mobile networks, wireless devices and television; Providing entertainment and sports related information services, where viewers can post, customize and share articles, video, images and commentary, form virtual communities, and engage in social networking" in International Class 41; and

- "Providing computer, mobile application and network services, namely, online non-downloadable software, web pages and portals featuring multimedia programs and entertainment content on sports, popular culture, news, reality, drama and comedy, distributed via various media platforms, including via the internet, mobile networks, wireless devices and television; Hosting an online community website where viewers can post, customize and share stories, articles, video, images and commentary, form virtual communities and engage in social networking all in the field of sports" in International Class 42.

19.     On March 5, 2019, Overtime filed Application Serial No. 88/325,985 with the USPTO to register the Overtime Mark for use in connection with "Clothing and apparel, namely, t-shirts, tank tops, hooded sweat shirts, headwear, shorts" in International Class 25.

20.     The USPTO did not cite Defendant's OSU Marks as bars to registration of the Overtime Mark.  As a result, Application Serial No. 88/319,783 was published for opposition on July 9, 2019 and Application Serial No. 88/325,985 was published on June 18, 2019.

**B.     Defendant Ohio State's OSU Marks and Threat of Legal Action**

21.     Defendant is a public university of Ohio that, among other things, hosts university-related athletic teams.  Defendant is not a digitally native sports network, nor does it offer one.

22.     Defendant purports to use the OSU Marks in connection with its university business and its sports teams.  Defendant's OSU Marks are composed of an octagon, which is to say they consist of eight straight lines joining at equal angles.  They contain no rounded lines or rectangles.  The inner shape in each precisely tracks the eight-sided outer shape, presenting an octagon-within-octagon design.  Examples of Defendant's marks are shown below.



23.     Defendant's OSU Marks frequently appear in conjunction with the house mark THE OHIO STATE UNIVERSITY.

24.     Indeed, Defendant's Brand Guidelines require that the Block O "be displayed with the wordmark at all times, and never used alone to identify the university or its units."  *See* **Exhibit B** (printout from brand.osu.edu/logo).

25.     Defendant has been coexisting with Overtime without any confusion and without preventing either Ohio State or Overtime from maintaining goodwill and commercial impressions in their respective marks.

26.     Ohio State's trademark registrations for the OSU Marks coexist with numerous other U.S. registrations for O, O-formative marks, and O designs in connection with a wide variety of goods and services that predate Defendant's registration.  Moreover, there are numerous registrations for the term "O" by other sports teams, several of which have registrations for goods and services in which Ohio State claim rights, including several that consist of an octagonal-shaped O more similar to the OSU Marks than they are to the Overtime Mark.

27.     On July 26, 2019, long after Overtime began using the Overtime Mark in connection with its sports entertainment business, Defendant sent Overtime a demand letter attached hereto as **Exhibit A**.  In this letter, Defendant alleged that use of the Overtime Mark was likely to cause confusion with Ohio State's OSU Marks and demanded that Overtime cease use of the Overtime Mark, expressly abandon its trademark applications for the Overtime Mark,

Serial Nos. 88/325,985 and 88/319,783, and provide "written assurances" that Overtime would not make any future use of the Overtime Mark.

28. On August 23, Overtime responded by letter, recounting in a detailed manner its counterarguments and defenses to Ohio State's claim. This letter is attached hereto as **Exhibit C**.

29. On October 16, 2019, Defendant filed a Consolidated Notice of Opposition against Overtime's trademark applications, which the TTAB instituted as Opposition No. 91251671 (the "Opposition"). Defendant asserted claims for likelihood of confusion under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), dilution by blurring under Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), and false suggestion with a person, living or dead, under Section 2(a) of the Lanham Act, 15 U.S.C. § 1052(a). The Opposition remains pending before the TTAB.

30. As a result of Defendant's legal threats, Overtime has been put in the untenable position of not knowing if or when Defendant may sue or take other action against Overtime or otherwise interfere with Overtime's selling, advertising, and promotion of its sports programming business or goods offered in connection with such business. Defendant's threats cast a cloud over Overtime's business.

31. In order to resolve this situation, Overtime now brings this action for a declaratory judgment that (i) its use of the Overtime Mark in connection with its sports programming business and goods and services offered in connection with such business does not infringe any rights that Defendant purports to have in its claimed OSU Marks; (ii) there is no likelihood of confusion arising from Overtime's use or registration of the Overtime Mark in connection with its sports programming business or goods and services offered in connection with such business; (iii) Overtime has not engaged in any acts of unfair competition with Defendant; and (iv) Overtime has not violated any other purported rights of Defendant.

**COUNT I**

<u>**CLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**</u>

32.     Overtime realleges and incorporates by reference each of the allegations set forth in the paragraphs above as if fully set forth herein.

33.     Defendant has claimed that Overtime's use and registration of the Overtime Mark is likely to cause confusion with Defendant's OSU Marks.  Because of Defendant's actions and demands described herein, there is a substantial controversy between the parties, who have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

34.     The differences between the parties' trademarks and manners of use prevent any likelihood of confusion, including without limitation because the Overtime Mark and the OSU Marks are not similar in appearance, the distinctiveness of the OSU Marks is limited, the parties' goods and services are sufficiently different, and both parties frequently use their respective house marks in conjunction with the marks at issue.  Further, Ohio State has coexisted with the use of the Overtime Mark for a significant period of time without objection and without confusion.

35.     There are numerous O marks, O-formative marks, and O designs in use by third parties in connection with the relevant goods and services, such that consumers will not presume that all goods and services offered under O or O-formative marks emanate from a common source.

36.     Overtime has taken no action to intentionally associate itself or its products with Defendant or its products.

37.     Overtime's use and registration of the Overtime Mark in connection with its sports programming business and goods and services offered in connection with such business

has not caused, and is not likely to cause, confusion, mistake, or deception as to the source, origin, sponsorship, or approval of Overtime's products vis-à-vis Ohio State.

38.     Overtime's use of the Overtime Mark in connection with its sports programming business or goods and services offered in connection with such business does not violate any rights of Defendant, including any rights under Sections 32 or 43 of the Lanham Act, 15 U.S.C. § 1114, 1125(a), or any state infringement or unfair competition laws.

39.     Overtime is entitled to a declaration that its use of the Overtime Mark, and any registrations for such mark, in connection with its sports programming business or goods offered in connection with such business is not likely to create confusion in the marketplace with Defendant's OSU Marks and that Overtime has not violated Sections 32(1) or 43(a) of the Lanham Act, 15 U.S.C. § 1114(a), 1125(a), or applicable state law, nor engaged in any acts that would constitute unfair business practices under applicable law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Overtime requests that this Court enter judgment against Defendant The Ohio State University and in favor of Overtime on its claims as follows:

(a)     declaring that Overtime, in the promotion of its sports programming business and goods and services offered in connection with such business, has not infringed on any rights, including any trademark-related rights, of Ohio State and that Overtime has the lawful right to use the Overtime Mark on or in connection with its business and products, and to advertise and promote the same;

(b)     declaring that Overtime's use of the Overtime Mark for its sports programming business and goods and services offered in connection with such business: (i) is not likely to create confusion among consumers as to the source or sponsorship of Overtime's products and is not likely to cause consumers to mistakenly believe that Overtime's products are associated,

sponsored or are otherwise approved by Defendant, or that there is some relationship between the parties; and (ii) does not constitute trademark infringement or unfair competition in violation of the Lanham Act or under applicable state law or common law, or otherwise constitute unfair business practices under applicable state or common law;

(c)    permanently enjoining Defendant from asserting claims or filing actions against Overtime arising out of Overtime's use of the Overtime Mark in connection with sports programming and goods and services, including apparel, shoes and accessories, objecting to Overtime pending trademark applications for the Overtime Mark, or interfering with any registrations that issue therefrom, or making any threats against Overtime for infringement, or interfering in any way with Overtime's use or registration of the Overtime Mark in connection with its sports programming business and goods and services offered in connection with such business;

(d)    issuing an order enjoining Defendant from proceeding with TTAB Opposition Proceeding No. 91251671 and directing Defendant to voluntarily dismiss TTAB Opposition Proceeding No. 91251671 with prejudice;

(e)    awarding Overtime any and all damages sustained by it as a result of Defendant's threats of legal action and any other interference by Defendant with Overtime business activities;

(f)    awarding Overtime its costs in this action, including attorneys' fees, together with such other and further relief as the Court may deem just and proper; and

(g)    Plaintiff demands a jury trial in this action.

Dated:  December 23, 2019

FROSS ZELNICK LEHRMAN & ZISSU, P.C.

By: _____

    Laura Popp-Rosenberg
    Leo Kittay
    Sydney Kipen
151 West 42nd Street, 17th Floor
New York, New York 10036
Phone:  (212) 813-5900
Fax:  (212) 813-5901
Email:  *lpopp-rosenberg@fzlz.com*
      *lkittay@fzlz.com*
      *skipen@fzlz.com*

*Attorneys for Plaintiff*

# EXHIBIT A



**Samantha M. Quimby**
Member
614.559.7282 (t)
614.464.1737 (f)
SQuimby@fbtlaw.com

July 26, 2019

<u>**Via Electronic Mail**</u>: (ecohen@ecohenlaw.com)

Eric N. Cohen, Esq.
Eric N. Cohen & Associates, PLLC
276 Fifth Avenue
Suite 805
New York, New York 10001

Re:     **O & Design—Trademark Application Serial No.  88/325,985**

Dear Mr. Cohen:

This firm has been retained by the Ohio Attorney General to represent The Ohio State University ("Ohio State") in connection with intellectual property matters.

We recently learned that you have filed trademark applications on behalf of your client, Overtime Sports, Inc., for the below O & Design mark with the United States Patent and Trademark Office for use in connection with "Clothing and apparel, namely, t-shirts, tank tops, hooded sweat shirts, headwear, shorts" (Ser. No. 88/325,985) as well as a number of products and services dedicated to field of sports and entertainment (Ser. No. 88/3197,83):



Ohio State owns numerous trademarks for its colors, logos and slogans used in connection with Ohio State and its athletic teams, including BUCKEYE(S) (in singular and plural), the school colors of scarlet and gray, the "BLOCK O" design, BRUTUS (the name of Ohio State's beloved school mascot), OHIO STATE, OSU, O-H-I-O, the O-H-I-O- silhouette, and the trade dress of its football uniforms, including its athletic stripe (collectively, the "Ohio State Marks").  Ohio State licenses the Ohio State Marks to selected parties for use in connection with a wide variety of goods and services.  Such licenses include strict written terms designed to protect and preserve the reputation and goodwill associated with the Ohio State Marks.

Eric N. Cohen, Esq.
July 26, 2019
Page 2

Specific to the matter at hand, Ohio State has also used the "Block O" in connection with Ohio State's athletic teams and recreational programs since at least as early as 1898 (the "Block O Mark") and today, it is now one of "the" main source identifying marks for all things Ohio State, including its educational services.  Some examples of the renditions of the Block O Mark are below:



Ohio State displays the Block O Mark on uniforms of student athletes, cheerleaders, drum majors, and marching band members, as well as on t-shirts, hats, shoes, socks, pullovers, hoodies, pants, and shorts worn by students and fans alike.  Indeed, the Block O Mark is permanently displayed in the middle of the football field at Ohio Stadium where millions of viewers have seen the Ohio State Buckeyes football team play its home games.

Thus, we are very concerned that your client's actual usage of a block styled "O" in connection with clothing apparel and sports and entertainment services greatly increases the likelihood of confusion.

While Ohio State recognizes there are many legitimate, non-confusing uses of the letter "O", there can be no doubt that when the vast majority of people see a Block "O" they associate it with Ohio State and its Block O Marks. [1]  Thus, while  Ohio State has several legal remedies at its disposal, it would prefer to explore the possibility of achieving an **amicable resolution** of the matter promptly without initiating any formal proceedings at the UPSTO or otherwise.  For an amicable resolution to occur, however, we must hear from you promptly, and in any case, no later than Wednesday, August 7, 2019.  For purposes of transparency, we would expect a resolution to come about as follows:

1. Your client's agreement to phase out all use of the Block "O" as it currently appears;

2. Your client's agreement to revise the design mark so that the "O" is completely rounded – or at least not in its current arguable "Block O" format;

3. Your client's filing of an express abandonment of Trademark Application Serial

---

[1] Most in the consuming public would not be in a position to view your client's mark "up close," so it is especially concerning that the mark appears less rounded and more "block-like" the further one moves away from it.

One Columbus, Suite 2300 | 10 West Broad Street | Columbus, OH  43215-3484 | 614.464.1211 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Eric N. Cohen, Esq.
July 26, 2019
Page 3

       Nos. 88/325,985 and 88/3197,83; and

4. Your client's written assurances that it will not make any future use of the Ohio State Marks in support of its commercial enterprise.

If your client will agree to the above terms for resolution, please contact us by close of business **Wednesday, August 7, 2019**.

This is not a complete recitation of our client's rights or remedies in this matter, and all such rights and remedies are hereby specifically reserved.

Sincerely,

FROST BROWN TODD LLC

Samantha M. Quimby

cc: Michael Steffensmeier, Esq., Legal Affairs, Ohio State
    Robert Cleveland, J.D., Trademark & Licensing Services, Ohio State

0104751.0537680  4853-0319-9132v2

# EXHIBIT B

Help (http://www.osu.edu/help.php)   BuckeyeLink (http://buckeyelink.osu.edu/)   Map (http://www.osu.edu/map/)   Find People (http://www.osu.edu/findpeople.php)
Webmail (https://email.osu.edu/)   Search Ohio State (http://osu.edu/search)

# BRAND GUIDELINES (HTTPS://BRAND.OSU.EDU/)

Search

MENU

**LOGO** / ELEMENTS (LOGO/#ELEMENTS) / CONFIGURATIONS (LOGO/#CONFIGURATIONS) / MINIMUM SIZE (LOGO/#MINIMUM-SIZE)
/ COLOR VARIATIONS (LOGO/#COLOR-VARIATIONS) / PLACEMENT (LOGO/#PLACEMENT) / OTHER MARKS (LOGO/#OTHER-MARKS) / RESOURCES (LOGO/#LOGO-RESOURCES)

## LOGO BASICS

Ohio State's particular model of brand architecture is known as "monolithic," or a "branded house," where the university's logo is the primary identifier in all communications.

The consistent and proper use of the university logo not only strengthens recognition for Ohio State but also projects the university's established reputation onto all of the many individual entities that make up our university.

To reinforce the university logo — and thereby the university itself — as our foundation, our identity system prohibits the use of any additional iconography, marks or artwork in conjunction with the university logo or any supplemental signature. Approved secondary identity elements may be used as supporting art, but they should always be clearly separated from our official marks.

---

The ® mark

When the logo appears on merchandise or apparel, it should always have a registration mark (®). The registration mark is not needed on stationery, marketing collateral or interactive communications.



OUR BRAND (OUR-BRAND/)

SECONDARY SIGNATURES
(SECONDARY-SIGNATURES/)

# Logo elements



The university logo pictured above anchors the entire visual identity system. It is used on all communications, and its effectiveness relies on consistent presentation.

By adhering to a standardized use of our logo elements, we reinforce the image of Ohio State as a cohesive, powerful entity and amplify the impact of our visual communications.

1. **Block O**
   Ohio State's Block O is the visual identifier of the university and all of its colleges, offices, libraries, schools, centers, departments, programs, and other units. The Block O should be displayed with the wordmark at all times, and never used alone to identify the university or its units.
2. **The wordmark**
   The wordmark is an adjusted letterform version of the name "The Ohio State University" combined with the baseline, which anchors and protects the integrity of the wordmark. It cannot be replicated through typesetting.
3. **The logo**
   Together the Block O and wordmark are known as the logo.

Always use official electronic artwork. The spacing and positioning of the logo elements should not be recreated or altered for any reason.

# Configurations and clear space



**1. Horizontal**

**2. Vertical**

**3. Stacked**

There are three approved configurations of the logo, of which horizontal (1) is the preferred. The vertical and stacked versions are distinct versions and should not be recreated.

1. **Horizontal logo (preferred)**
2. **Vertical logo (second choice)**
   The vertical configuration may be used in circumstances where it is impractical to use the preferred horizontal version.
3. **Stacked logo (limited use)**
   The stacked logo is for use in restricted spaces where neither the horizontal nor the vertical version is feasible, such as one-column ads, podium signs, or certain merchandise or apparel.

"Clear space" is the protected area around the logo that maximizes its impact. This space must be kept free of all other graphics and text, including other logos. It is also the minimum distance the logo can be from the edges of an electronic document or printed piece.

To preserve the university logo's prominence, no additional iconography, marks or artwork may be used in conjunction with it or any secondary signature.

Approved secondary identity elements may be used as supporting art, but they should always be clearly separated from the logo.

The logos must not be altered in any way, and additional configurations are not permitted. Do not recreate the logo.

The minimum required amount of clear space is defined by the width of the Block O.

## Minimum size



The Block O should not appear smaller than 0.375 inches tall in print. The minimum size of the Block O on screen is 32 pixels tall, but 50 pixels tall is preferred if possible. The proportions of the Block O in relation to the wordmark and baseline should not be changed.

Special circumstances such as favicons and app icons require alternate logos that you can find in logo resources (logo/logo-resources.html). If additional exception cases arise, email identity@osu.edu (mailto:identity@osu.edu).

## Color variations



The preferred use of the logo is scarlet and gray (1) on a white or light background. This version should be used whenever possible. When the preferred use is not feasible, the following variations (and only these variations) may be used:

1. **Scarlet and gray** (preferred)
2. **Scarlet and black**
   For use when the background requires a darker representation of the wordmark.
3. **Black**
   For use when ink colors are restricted or the use of scarlet creates a design conflict. (However, remember to always incorporate a presence of scarlet in your design.)
4. **Scarlet**
   For use when ink colors are restricted, to achieve a particular design effect.
5. **Gray**
   For use when ink colors are restricted, to achieve a particular design effect.

There are two versions of the logo designed to maximize its impact when it appears on scarlet, black, or some other dark background.

6. **One-color full reverse** (preferred reverse version)
7. **Two-color reverse**
   When a presence of scarlet is needed in a reverse logo situation, use the two-color reverse version.



Logo placement is important, especially when paired with a unit identifier (unit-id/).

Appropriate placements for each logo configuration are illustrated below. Although there is flexibility for alignment within these areas, the placements shown are optimal. The highlighted quadrants show the preferred position for each configuration.

These placements also apply to secondary signatures (secondary-signatures/elements.html).

## Other Marks

### University seal

The university's official seal has been edited to include the iconic Block O. As in the past, use of the seal is limited to the president's office and the board of trustees. The seal is not available for download, and special permission must be obtained for use. Contact identity@osu.edu (mailto:identity@osu.edu).

### Athletics logo

The athletics logo, which includes our iconic Block O, has been updated for greater legibility in digital media. Use of the athletics logo is limited to sports teams, athletics marketing communications, and trademarked merchandise. The athletics logo is not available for download. Contact athletics creative services director Andy DeVito (mailto:DevitoA@buckeyes.ath.ohio-state.edu) or trademark and licensing (http://trademarklicensing.osu.edu/) for more information.

# Logo resources

- Horizontal, vertical and stacked configurations
- All available color variations
- Horizontal and stacked word marks
- Logo and wordmark with ®

Download logo assets (assets/downloads/osu-logo.zip)

DOWNLOADS

 (downloads.html)

EXTENDED COLOR PALETTE



(color/extended-colors.html)

Case 1:19-cv-07185-AMD-CLP   Document 1   Filed 12/23/19   Page 27 of 37 PageID #: 27

 (gallery/)

HELP



(help.html)

THE OHIO STATE UNIVERSITY (http://www.osu.edu/)

© 2019 | Student Academic Services Building | 281 W. Lane Ave. | Columbus, Ohio 43210 | 614-292-OHIO (tel:614-292-OHIO)

Contact: Admissions (mailto:askabuckeye@osu.edu) | Webmaster (mailto:webmaster@osu.edu) | Page maintained by University Marketing (https://universitymarketing.osu.edu/)

Request (http://www.osu.edu/webmaster.php) an alternate format of this page | Web Services Status (http://ocio.osu.edu/status/) | Nondiscrimination notice (http://hr.osu.edu/policy/resources/110nondiscrimnotice.pdf)

(http://www.facebook.com/osu) (http://twitter.com/OhioState) (http://www.youtube.com/user/OhioStateUniversity) (http://osu.edu/rss-feeds.html)

# EXHIBIT C



**Leo Kittay**
Partner

151 West 42nd Street, 17th Floor
New York, NY 10036

T 212.813.8210
kittay@fzlz.com

August 23, 2019

**BY EMAIL**

Samantha M. Quimby, Esq.
Frost Brown Todd LLC
One Columbus, Suite 2300
Columbus, OH 43215
*SQuimby@fbtlaw.com*

Re:     Allegation of Trademark Infringement by The Ohio State University
        (Our Ref: OVSP 1910331)

Dear Ms. Quimby:

As you know from our August 7, 2019 letter, we represent Overtime Sports, Inc.
("Overtime").  We write in response to your July 26, 2019 letter, in which your client
The Ohio State University ("Ohio State") objects to Overtime's use and registration of
its O design mark pictured below:



(the "Overtime Mark") based on Ohio State's own Block O Mark, shown in several
forms in your letter.

Overtime, itself the owner of valuable intellectual property, respects the intellectual
property rights of others and thus has thoughtfully considered the allegations and
demands contained in your letter.  However, including without limitation for the reasons
set forth below, our client is confident that the Overtime Mark is simply unlikely to
create consumer confusion or harm your client's rights in any way and, thus, refuses to
comply with your client's demands.

Samantha M. Quimby, Esq.
August 23, 2019
Page 2

**Ohio State's Block O Mark is Weak**

A court is sure to view the Block O Mark as weak.  Third-party use of and registrations
for the letter O, O-formative marks, and O designs in International Class 25 are myriad.
In particular, your client's Block O Mark, referenced in your letter, coexists on the
registry with a number of "O" marks in International Class 25, including the following:

| Registration Number | Mark |
| --- | --- |
| U.S. Reg. No. 4,683,965 |  |
| U.S. Reg. No. 5,381,438 |  |
| U.S. Reg. No. 4,632,592 |  |
| U.S. Reg. No. 5,761,578 |  |
| U.S. Reg. No. 5,511,530 |  |

Samantha M. Quimby, Esq.
August 23, 2019
Page 3



| U.S. Reg. No. 5,231,236 | |
| U.S. Reg. No. 4,744,755 | |
| U.S. Reg. No. 4,282,607 | |
| U.S. Reg. No. 4,109,772 | |
| U.S. Reg. No. 3,496,633 | |

In addition to all of these, there are numerous registrations for the term "O" by other sports teams, several of which have registrations for goods in International Class 25, including the following:

| Team and, where applicable, Registration Number | Mark |
| --- | --- |
| University of Oklahoma<br><br>U.S. Reg. No. 3,035,551 | |

Samantha M. Quimby, Esq.
August 23, 2019
Page 4

| | |
|---|---|
| Orlando Magic<br><br>U.S. Reg. No. 4,422,720 |  |
| University of Nebraska Omaha<br><br>U.S. Reg. No. 4,052,877 |  |
| University of Oregon<br><br>U.S. Reg. No. 2,859,374 |  |
| Baltimore Orioles<br><br>U.S. Reg. No. 3,349,801 |  |
| Oklahoma State University<br><br>U.S. Reg. No. 2,708,673 |  |
| Oregon State University<br><br>U.S. Reg. No. 3,640,141 |  |
| Ogden Professional Baseball, Inc.<br><br>U.S. Reg. No. 5,106,385 |  |

Samantha M. Quimby, Esq.
August 23, 2019
Page 5

Your client operates in a crowded field and, as a result, any rights it may claim to have in the Block O Mark are exceedingly narrow. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1162-65 (9th Cir. 2009). In *One Industries*, the Court of Appeals for the Ninth Circuit was faced with determining whether a longstanding brand's rights in an O design mark were sufficiently strong to prevent a younger company from adopting a somewhat different O design. The court explained that, "[i]n a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd." The opinion, which acknowledged only three other companies with similar O marks, specifically noted that even the strength of an inherently strong mark "decreases" when "similar marks permeate the marketplace." *Id.* at 1164. In the end, the court sustained the lower court's finding upon summary judgment of non-infringement. *Id.* It is not apparent to us why your client believes it would fare better against Overtime.

Moreover, common geometric shapes "are regarded as not being inherently distinctive, in view of the common use of such shapes in all areas of advertising." *McCarthy on Trademarks § 7:29.* "[B]asic [geometric] shapes such as circles, squares, *ovals* and rectangles, when used as vehicles for the display of a word mark, do not indicate the origin of the goods and hence cannot be appropriated exclusively, absent a showing of secondary meaning." *Dow Corning Corp. v. Applied Power Indus., Inc.*, 322 F. Supp. 943, 945 (N.D. Ill. 1970) (emphasis added). And single-letter marks have been said to require secondary meaning. *See, e.g., Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 786 F. Supp. 182, 193 (E.D.N.Y. 1992) (rejecting claim that letters are protectable without proof of secondary meaning); *see also Star Industries, Inc. v. Bacardi & Co. Ltd. Corp.*, 71 U.S.P.Q.2d 1026, 2003 WL 23109750 (S.D.N.Y. Dec. 31, 2003), *aff'd*, 412 F.3d 373, 75 U.S.P.Q.2d 1098 (2d Cir. 2005) ("O" is descriptive of an orange flavored vodka and no secondary meaning was proven; the Second Circuit held that a stylized letter "O" was sufficiently different to be inherently distinctive, but was weak and not infringed). As you no doubt are aware, when one court specifically held that your client's marks taken together, including the Block O Mark, were "quite strong," it was careful to limit this finding to the very narrow "context of a website or publication providing information exclusively related to Ohio State athletics." *See Ohio State Univ. v. Thomas*, 738 F. Supp. 2d 743, 747, 750 (S.D. Ohio 2010) (granting Ohio State's motion for a temporary restraining order and a preliminary injunction against "electronic magazine called the 'Ohio State Buckeyes E-Book,' [which] employs the trademarks 'Ohio State' and 'Buckeye' in its name and contains numerous photographs depicting current and former Ohio State athletes in competition"). Of course, our client's services are not within that narrow context. Therefore, even if a court were to determine that the Block O Mark itself had secondary meaning, the scope of the secondary meaning would be too narrow to reach Overtime's goods and services.

**The Marks are not Similar in Appearance**

The Block O Mark and the Overtime Mark are not similar in appearance. The most distinctive features of the Block O Mark are that it is an *octagon* with no rounded lines,

Samantha M. Quimby, Esq.
August 23, 2019
Page 6

eight sides and eight corners, and that the inner shape precisely tracks the eight-sided shape. The Overtime Mark, on the other hand is an *oval with no corners at all*. Even the interior of the Overtime Mark is decidedly distinguishable from the interior of the Block O Mark in that it has only *four* sides and rounded corners on the interior border. This effect presents a rectangle within an oval, rather than the octagon-within-an-octagon design your client's mark embodies. *When a trademark owner seeks exclusive rights in a shape as simple as an octagon, those rights certainly don't extend far enough to prevent another brand owner from using an oval.*

Furthermore, the law is clear that courts do not compare marks in isolation; rather, the entirety of the marks as well as the manner in which they are encountered in the marketplace must be considered. *See Star Indus., Inc.*, 412 F.3d at 386 (2d Cir. 2005) (holding no clear error where "[t]he court reasoned that while the two 'O' marks appear very similar when viewed in isolation, this similarity is tempered by the fact that the respective packaging is very different: the significance of the similarity of the 'O' designs is undercut by the dissimilarity of the products' respective labels as a whole"; and noting "each label prominently displays the brand logo-the stylized 'Bacardi' logo and bat symbol on the Bacardi O label, and the stylized 'Georgi' logo on the Georgi O label").

Were a court to consider the larger contexts here, it would be wholly unconcerned that consumer confusion would result. First, the respective marks are presented in different colors. The Block O Mark appears in or against the Ohio State scarlet color, while the Overtime Mark typically appears in white on black or in a multi-color presentation. Second, both parties use their marks frequently in conjunction with their respective house marks, namely your client's THE OHIO STATE UNIVERSITY mark. Notably, your client's own Brand Guidelines require that "*[t]he Block O should be displayed with the wordmark at all times, and never used alone* to identify the university or its units." *See* https://brand.osu.edu/logo/ (emphasis added). As courts regularly have held, the use of a party's house mark is critical in that it has the potential to reduce or eliminate any confusion. *See Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (explaining that a defendant's "prominent use of its house mark significantly, if not altogether, eliminates the likelihood that consumers will be confused as to the source of the parties' products"). Therefore, the marks – whether on their own or within the larger commercial context – are not similar in appearance.

**No Actual Confusion**

We are unaware of any actual confusion resulting from Overtime's use of the Overtime Mark. And your letter references none, either. All this, despite the fact that Overtime and Ohio State have coexisted – and in the case of our client at least, flourished – in the market for over two years. *See Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d. Cir. 1999) (lack of evidence about actual confusion after an ample opportunity for confusion "can be a powerful indication that the junior trademark does not cause a meaningful likelihood of confusion").

{F3168015.3 }

Samantha M. Quimby, Esq.
August 23, 2019
Page 7

**The Goods and Services are Sufficiently Different**

While the parties both offer clothing and involve sports, their respective companies are markedly different.  Overtime is a distributed sports network, offering programming through multiple platforms including Instagram, Twitter, Facebook, YouTube, Snapchat, and television.  Through innovative technology, various online platforms, and multiple formats, Overtime users capture and edit sports footage, which they subsequently can share online.  This interface has led to over 250 million minutes of watch time being made available to users by users each month.  On the other hand, Ohio State is a public university that hosts university-related athletic teams.  Ohio State is not a digitally native sports network, nor does it offer one.  The parties have different missions, different goals, and different businesses.  Just because Overtime and Ohio State both offer clothing and are connected to sports does not mean that they are the same or that consumers are likely to be confused.

**Ohio State has Delayed in Raising an Objection**

Ohio State has inexplicably delayed in objecting to our client's mark.  Your client must have known about Overtime given the great success our client has achieved and the widespread media attention it has received over the past years.  *See Sports Business Journal*, "For SNY, summer is time to 'keep learning'" (June 19, 2017) ("'Overtime has become the go-to place for crowd-sourced and high-quality high school sports video'");[1] *Recode*, "Overtime wants to turn high school jocks into social media stars" (Feb. 14, 2018);[2] *Deadline*, "Overtime Scores Funding In Bid To Build Out Streaming Sports Network" (Feb. 14, 2018) (discussing Overtime's success in raising funding);[3] *Variety* "Overtime Banks $23 Million From Spark Capital, MSG Networks, Carmelo Anthony and Others" (Feb. 14, 2019) (same; "Overtime's videos are viewed more than 550 million times per month, up from 112 million views in January 2018, according to the company. It now has 55 employees, more than double 24 a year ago, and Overtime plans to staff up in content, talent, ad sales, and commerce.").[4]  In fact, Overtime has been covering famous Ohio-based athletes for years, including Darius Bazley, Rocket Watts, Rob Bob, and most notably LaMelo Ball, arguably the world's most famous young basketball player.  In addition, last November, when Overtime put up an eye-catching billboard outside of Cleveland, local Ohio press, as well as national press, covered the event.[5]  Despite all of this, our client had not received an objection until now.  This is a

---

[1] https://www.sportsbusinessdaily.com/Journal/Issues/2017/06/19/Media/Sports-Media.aspx
[2] https://www.vox.com/2018/2/14/17009016/overtime-mac-maclung-funding-dan-porter-omgpop-kevin-durant-andreessen
[3] https://deadline.com/2018/02/overtime-scores-funding-in-bid-to-build-out-new-streaming-sports-network-1202288108/
[4] https://variety.com/2019/digital/news/overtime-funding-23-million-spark-capital-msg-carmelo-anthony-1203137723/
[5] *See, e.g.*, https://www.wkyc.com/article/sports/high-school/new-lamelo-ball-billboard-appears-in-downtown-cleveland/95-612973199; https://cavaliersnation.com/2018/11/09/lamelo-ball-responds-billboard/; https://www.tmz.com/2018/11/09/lamelo-ball-lebron-treatment-billboard-welcome-ohio/

Samantha M. Quimby, Esq.
August 23, 2019
Page 8

clear indication that our clients and their respective marks have been and can continue to coexist without issue and that Ohio State has not been suffering any meaningful harm as a result of Overtime's use of its mark.

*          *          *

Please review this letter with your client and advise us if you have any questions or would like to discuss this matter further.  However, if we do not receive a response from you promptly, we will presume that your client has withdrawn its demand and that Overtime can safely consider this matter closed.

This letter is not meant to be an exhaustive recitation of our client's legal position.  For this reason, we continue to expressly reserve all of Overtime's rights, claims, defenses and remedies.

Very truly yours,

Leo Kittay

cc:  Sydney Kipen, Esq.

{F3168015.3 }